1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11  RIDGE TOP RANCH, LLC,              No.  CIV. S-13-2462 LKK/CKD

12              Plaintiff,

13        v.                           **ORDER**

14  UNITED STATES FISH & WILDLIFE
    SERVICE; DANIEL M. ASHE,
15  DIRECTOR, UNITED STATES FISH
    AND WILDLIFE SERVICE,
16
                Defendants.
17

18

19      Plaintiff Ridge Top Ranch, LLC has sued defendants U.S. Fish

20  and Wildlife Service ("FWS," or the "Service"), and FWS's

21  Director, Daniel M. Ashe, alleging violations of the Endangered

22  Species Act ("ESA") and the Administrative Procedure Act ("APA").

23  Ridge Top now moves for a preliminary injunction. For the reasons

24  set forth below, Ridge Top's motion will be partially denied. The

25  court requires additional briefing by the defendants as to the

26  remainder of the motion, and will hear oral argument from the

27  parties thereon.

28

                                    1

1    **I.    BACKGROUND**

2         This case is motivated by a proposed highway construction

3    project in Solano County, described as follows:

4               The Solano Transportation Authority (STA) is
5               a   Joint   Powers   Authority   with   members
                including   the   cities   of   Benicia,   Dixon,
6               Fairfield, Rio Vista, Suisun City, Vacaville,
                and Vallejo, and the County of Solano . . . .
7
                I-80  is  a  major  transcontinental  highway
8               route,  typically  six  to  eight  lanes.  The
                corridor within Solano County functions as an
9               essential   commuter   route   within   the   San
                Francisco Bay Area . . . .
10
                The  existing  I-80/I-680/SR  12  interchange
11              complex   was   constructed   approximately   40
                years ago, and current traffic demands have
12              resulted   in   extreme   congestion,   delays,
                substantial     traffic     diversion,     and
13              unacceptable  levels  of  service.  The  proposed
                improvements    are    designed    to    reduce
14              congestion, accommodate anticipated increases
                in traffic, and address safety concerns.
15
                Caltrans, in cooperation with the STA and the
16              Federal  Highway  Administration,  proposes  to
                improve    the    interchanges . . .   in    the
17              vicinity    of    City    of    Fairfield . . . .
                (Request for Proposals, Exh. B to Declaration
18              of  Timothy G. Roberts  ("Roberts Decl."), ECF
                No. 10-3.)
19
20   In connection with this effort, termed the I-80/I-680/SR-12

21   Interchange – Phase 1 Project ("Interchange Project"), the

22   California Department of Transportation ("Caltrans")[1] initiated

23   consultation with FWS regarding effects of Project on a number of

24

25   _____

26   [1] Defendants' opposition provides that "for the purposes of ESA
     Section 7 Compliance, Caltrans stands in the shoes of [the
27   Federal Highway Administration] as the federal action agency."
     (Opposition 3 n. 3.)
28

1   threatened and endangered species, including the callippe

2   silverspot butterfly and the California red-legged frog.

3        At the conclusion of the consultation, FWS issued a

4   Biological Opinion, dated April 16, 2012, which includes measures

5   "intended to avoid and minimize direct and indirect effects to

6   California red-legged frog," including the provision of

7   appropriate habitat compensation. (Biological Opinion 25, Exh. C.

8   to Roberts Decl., ECF No. 10-3.) Ridge Top highlights a portion

9   of the Biological Opinion which provides as follows:

> California red-legged frog habitat used for
> conservation will be: (1) preferably located
> within the California Red-Legged Frog
> Conservation Area defined in the Draft Solano
> HCP (SCWA 2009),[2] (2) within 0.7 mile [*sic*]
> of unobstructed California red-legged frog
> breeding habitat and non-breeding aquatic
> habitats, (3) within a California red-legged
> frog critical habitat unit or within the
> vicinity of frog critical habitat, and (4)
> approval [*sic*] by the Service. (Biological
> Opinion 26.)

18   The Biological Opinion also includes an Incidental Take Statement

19   authorizing "take incidental to the proposed action as: (1) the

20   injury and mortality of two adult or juvenile California red-

21   legged frogs; and (2) the capture, harm and harassment of all

22   California red-legged frogs within the construction footprint."

23   (Biological Opinion 58.)

---

[2] The referenced document appears to be the "Solano Multispecies Habitat Conservation Plan Final Administrative Draft," dated June 15, 2009, issued by the Solano County Water Agency, available at http://www.scwa2.com/Conservation_Habitat_FinalAdminDraft.aspx. (Biological Opinion 72.)

1   Subsequently, the Solano Transportation Authority ("STA")

2   issued a Request for Proposals, dated May 20, 2013, for

3   California red-legged frog and callippe silverspot butterfly

4   environmental mitigation habitat in connection with the

5   Interchange Project ("RFP"). (Request for Proposals, Exh. B to

6   Roberts Decl., ECF No. 10-3.) The RFP concludes with the

7   following:

8           Each proposal will be reviewed to determine
            if it meets the minimum documentation
9           requirements set forth above in Section 3.0
            [titled "Scope of Services"]. A Notice of
10          Intent to Award will be issued to the
            Mitigation Provider offering the lowest cost
11          proposal that meets the minimum requirements.
            STA staff will start contract negotiations
12          with the selected Provider pending final
            approval by USFWS and [the] Regional Water
13          Quality Control Board.
14
            The STA reserves the right to consider or
15          reject any and all bids at its own
            discretion. The STA further reserves the
16          right to reject all bids and issue a new RFP.
            (RFP 7, ECF No. 10-3.)
17

18  Ridge Top, together with its environmental consultant, WRA, Inc.,

19  submitted a proposal in response to the RFP, dated June 7, 2013;

20  the proposal concerns a conservation bank, on land owned by Ridge

21  Top, to be used for mitigation in Solano County. ("Ridge Top

22  Proposal," Exh. A to Roberts Decl., ECF No. 10-3.)

23      On May 30, 2013, shortly before Ridge Top submitted its

24  proposal, Caltrans "informed the Service via an electronic mail

25  (e-mail) message that they were planning to reinitiate

26  consultation on the April 16, 2012 [Biological Opinion]."

27

28

4

1  (Amended Biological Opinion 2, Exh. C to Declaration of Jennifer

2  Norris ("Norris Decl."), ECF No. 18-4.)

3      On June 14, 2013, FWS "met with Caltrans and [STA's]

4  consultant to discuss the proposed reinitiation. The meeting

5  focused on the gas valve lot relocation."[3] (Amended Biological

6  Opinion 2.) On June 19, 2013, FWS met with Caltrans and STA to

7  discuss the proposals submitted in response to the RFP. According

8  to the Amended Biological Opinion, "The Service was asked to

9  review the sites and provide feedback to STA and Caltrans prior

10  to their selection. STA stated that they favored the Ridge Top

11  Ranch site. The Service informed STA and Caltrans that Ridge Top

12  Ranch was not an appropriate site to offset the effects of the

13  project." (Amended Biological Opinion 3.)

14      STA thereafter sent WRA (Ridge Top's environmental

15  consultant) a letter, dated July 9, 2013, which provided in

16  pertinent part:

17          [STA] has evaluated all of the proposals and
            has determined your firm is the "Apparent
18          Successful Proposer" to provide California
            Red-Legged Frog, Callippe Silverspot
19          Butterfly, and Oak Woodland/Riparian Habitat
            for the [Interchange Project]
20          mitigation . . . . I use the term "Apparent
            Successful Proposer" since STA is in the
21          process of submitting your proposal and
            supplementary information to Caltrans for
22          submittal to [FWS] for review and approval.
            Final contract award is predicated on USFWS's
23          approval. (Exh. D to Roberts Decl., ECF
            No. 10-4.)
24

25

26

_____

27  [3] Though this point is not addressed in the parties' briefs, the
    "gas valve lot relocation" appears to be an aspect of the
28  Interchange Project unrelated to the Ridge Top Proposal.

On July 11, 2013, FWS "participated in a conference call with STA and Caltrans regarding the Ridge Top Ranch proposal. The Service explained that Ridge Top Ranch was not appropriate for the project. STA requested that the Service present [its] response in a letter." (Amended Biological Opinion 3.)

In a letter dated July 24, 2013, Caltrans notified FWS that it was requesting reinitiation of formal consultation on the Interchange Project. ("Reinitiation Request," Exh. B to Norris Decl., ECF No. 18-3.)

In a letter to STA and Caltrans, dated August 6, 2013, FWS set forth its view that, while the Ridge Top mitigation site "likely w[ould] provide adequate compensation for the callippe silverspot butterfly[,]" it would not "adequately compensate for the adverse effects on the California red-legged frog that would result from the [Interchange Project]." ("August 6 Letter," Exh. F to Roberts Decl., ECF No. 10-4.) In the Letter, FWS highlighted the importance of the frog being able to "complete long-distance movement between critical habitat units SOL-1, SOL-2, and SOL-3 [located in Solano County]." (Id. 2.) As the Interchange Project threatened loss of habitat connectivity in SOL-2, the FWS determined that "the compensation should include appropriate habitat connectivity." (Id.) The Ridge Top site was found lacking because it "is located at the southern end of critical habitat unit SOL-1 and it will not enhance or maintain movement through SOL-2 between the coast range and critical habitat units SOL-1 and SOL-3." (Id. 3.)

STA then sent WRA (Ridge Top's environmental consultant) a letter, dated August 12, 2013, which provided:

> STA's RFP . . . included an extensive list of minimum requirements for mitigation proposals. Key amongst them was that the mitigation proposals must have "*demonstrated ability to obtain approval by the US Fish and Wildlife Service by November 30, 2013.*"
>
> In order for STA to determine if your submittal would meet this requirement, Caltrans submitted WRA's proposal to the US Fish and Wildlife Service on July 9, 2013 for review and comment. STA and Caltrans also provided the Service supplemental information provided by WRA on July 3, 2013 regarding proximity of the site to breeding habitat; WRA's July 8, 2013 correspondence regarding further clarification about proximity to breeding habitat and known frog occurrences; and, WRA's July 15, 2013 correspondence regarding contamination issues at or near the proposed mitigation property.
>
> The Service has reviewed WRA's mitigation proposal and supplemental information and determined the Ridge Top Ranch will not adequately compensate for the adverse effects on the California red-legged frog that would result from the Interchange Project . . . .
>
> Unfortunately with this determination by the Service, your mitigation proposal does not meet the minimum requirements of STA's RFP . . . and therefore STA and Caltrans must move on to the next qualified submittal. (Exh. E to Roberts Decl., ECF No. 10-4.) (emphasis in original).

Ridge Top has filed with the court several internal FWS emails that it obtained through a Freedom of Information Act request. One such email, dated August 22, 2013, sent by a Deputy Assistant Field Supervisor in Sacramento, provides:

> I believe there is one very large problem with the current iteration of this letter, that being the approach of saying one site is better than another because it is closer to

the impact site. While this may be what we all want . . . this is not, and never has been, our mitigation policy in the office. [. . .] We do not require that impacts be compensated at the bank closest to the impact site. This is, in effect, what this current letter is doing. So whatever your rationale ends up being for choosing one site over the other, I think if you go down the current route of geographically limiting how far out compensation sites can be from the impact sites, it will put us in a very vulnerable legal position. (Exh. L to Roberts Decl., ECF No. 10-4.)

FWS subsequently sent STA and Caltrans a letter, dated September 3, 2013 ("September 3 Letter," Exh. J to Roberts Decl., ECF No. 10-4), which it characterizes as a "supplemental letter . . . restat[ing] that the Ridge Top Ranch site would be acceptable compensation for the callippe silverspot butterfly but would not be acceptable for California red-legged frog. [The] response further clarified what the Service considered appropriate habitat compensation for the described adverse effects to the California red-legged frog." (Amended Biological Opinion 4.)

Ridge Top, through its counsel, then sent FWS a letter, dated September 9, 2013, setting forth its position that the August 6 and September 3 Letters violated the ESA and the APA. (Exh. I to Roberts Decl., ECF No. 10-4.) Four days later, Ridge Top followed up with a sixty-day notice of its intent to sue FWS for violations of the ESA. (Exh. J to Roberts Decl., ECF No. 10-4.)

A Ridge Top employee avers as follows:

In a telephone conversation on November 22, 2013, involving representatives of Ridge Top,

WRA, Caltrans and [STA], the Caltrans and [STA] representatives stated in [*sic*] that that they have solicited bids for construction of the [Interchange] Project and expect to break ground in April or May of 2014. Based on the discussion during that telephone conversation, there is a real risk that Caltrans and the [STA] will be unwilling very soon to accept further delay to the [Interchange] Project that may result from Fish & Wildlife's position stated in its August 6 and September 3 letters mentioned above. During that conversation, the Caltrans and [STA] representatives specifically informed Ridge Top's representatives that the requirement in the 4/16/12 Biological Opinion that habitat mitigation be in place 60 days before [Interchange] Project construction begins may require them to obtain the mitigation sought by the Solano RFP elsewhere than from Ridge Top.[4] (Roberts Decl. ¶ 22.)

On November 26, 2013, Ridge Top filed suit against FWS, asserting claims under the APA, 5 U.S.C. § 706, and the citizen suit provisions of the ESA, 16 U.S.C. § 1540(g).

On December 5, 2013, Ridge Top filed the instant motion for preliminary injunction, seeking to enjoin defendants:

1) from taking any action that prevents Caltrans and the [STA] from obtaining habitat mitigation from Ridge Top pursuant to Ridge Top's winning proposal submitted in response to the [RFP], and

2) from taking any action that would directly or indirectly grant approval for Caltrans and/or the [STA] to obtain the mitigation described in the [RFP], including habitat mitigation for the California red-legged

---

[4] This declarant further avers that, unless the requested injunction is granted, "Caltrans and the [STA] will soon have no choice but to obtain such mitigation elsewhere than from Ridge Top." (Roberts Decl. ¶ 25.)

9

1
2
>           frog, from any source other than Ridge Top.
>           (Proposed Order ¶ 2, ECF No. 10-5.)

3

4   Ridge Top also seeks a declaration that "[t]he determination made

5   by [FWS] that Ridge Top's winning proposal does not provide

6   acceptable habitat mitigation under the ESA is . . . unlawful and

    is set aside and invalidated." (Id. ¶ 3.)

7

8       On December 19, 2013, FWS issued an amendment to the

9   Biological Opinion ("Amended Biological Opinion," Exh. C to

    Norris Decl., ECF No. 18-4.)

10      **II.   STANDARD**

11      "An injunction is a drastic and extraordinary remedy, which

12  should not be granted as a matter of course." <u>Monsanto Co. v.</u>

13  <u>Geertson Seed Farms</u>, 561 U.S. 139, ___, 130 S. Ct. 2743, 2761

14  (2010).

15      To obtain a preliminary injunction, a plaintiff "must

16  establish that he is likely to succeed on the merits, that he is

17  likely to suffer irreparable harm in the absence of preliminary

18  relief, that the balance of equities tips in his favor, and that

19  an injunction is in the public interest." <u>Winter v. Natural Res.</u>

20  <u>Def. Council</u>, 555 U.S. 7, 20 (2008).

21      Even if the moving party cannot show a likelihood of success

22  on the merits, "serious questions going to the merits and a

23  balance of hardships that tips sharply towards the plaintiff can

24  support issuance of a preliminary injunction, so long as the

25  plaintiff also shows that there is a likelihood of irreparable

26  injury and that the injunction is in the public interest."

27  <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1135

28

(9th Cir. 2011) (internal quotation omitted). <u>See</u> <u>also</u> <u>DISH</u>
<u>Network Corp. v. FCC</u>, 653 F.3d 771, 776 (9th Cir. 2011) ("To
warrant a preliminary injunction, [the moving party] must
demonstrate that it meets all four of the elements of the
preliminary injunction test established in <u>Winter</u>.").

In determining whether a preliminary injunction should
issue, the court is free to consider inadmissible evidence,
including hearsay. <u>Herb Reed Enters. v. Florida Entm't Mgmt.</u>, 736
F.3d 1239, 1250 n. 5 (9th Cir. 2013).

**III. ANALYSIS**

**A. Background law**

It is well-settled that FWS's issuance of a biological
opinion and an accompanying incidental take statement constitutes
final agency action subject to judicial review under the APA.
<u>Bennett v. Spear</u>, 520 U.S. 154, 178 (1997). The APA, in turn,
provides that "[a]gency action made reviewable by statute and
final agency action for which there is no other adequate remedy
in a court are subject to judicial review." 5 U.S.C § 704.
Judicial review of administrative decisions involving the ESA is
governed by another provision of the APA, 5 U.S.C. § 706(2),
which provides that the reviewing court shall "hold unlawful and
set aside agency action, findings, and conclusions found to
be . . . arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law." The Ninth Circuit has
directed courts assessing whether an agency has violated this
standard to proceed as follows:

> [The] court must determine whether the agency
> articulated a rational connection between the

1  |  facts found and the choice made. The court is
2  |  not empowered to substitute its judgment for
   |  that of the agency. As long as the agency
3  |  decision was based on a consideration of
   |  relevant factors and there is no clear error
4  |  of judgment, the reviewing court may not
   |  overturn the agency's action as arbitrary and
5  |  capricious. The basis for the decision,
   |  however, must come from the agency. The
6  |  reviewing court may not substitute reasons
7  |  for agency action that are not in the record.

8  Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, 273 F.3d

9  1229, 1236 (2001) (internal citations omitted).

10  **B.  Much of the relief sought by Ridge Top is inappropriate for a preliminary injunction**

11

12  Even if Ridge Top is correct that FWS's actions to date have

13  violated the APA, much of the remedy it seeks is simply

14  inappropriate for preliminary injunctive relief.

15  "[A] preliminary injunction is an injunction that is issued

16  to protect plaintiff from irreparable injury and to preserve the

17  court's power to render a meaningful decision after a trial on

18  the merits." 11A Charles Alan Wright & Arthur R. Miller, Federal

19  Practice and Procedure: Civil § 2947 (2d. ed. 2013) ("Purpose and

20  Scope of Preliminary Injunctions").

21  The first part of the preliminary injunction sought by Ridge

22  Top would enjoin FWS "from taking any action that prevents

23  Caltrans and the [STA] from obtaining habitat mitigation from

24  Ridge Top pursuant to Ridge Top's winning proposal submitted in

25  response to the [RFP]." (Proposed Order ¶ 2.) Such an injunction

26  would go far beyond preserving the status quo pending a

27  determination of the merits of Ridge Top's case. Instead, it

28  would essentially force FWS to approve the Ridge Top Proposal by

vacating the agency's determination that this Proposal failed to provide acceptable habitat mitigation for the California red-legged frog. There is simply no reason for the court to make such an order at such an early stage of the litigation. As the Ninth Circuit has noted, the ESA imposes a "rigorous duty" on agencies: "Each Federal agency shall insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species **or result in the destruction or adverse modification of [critical] habitat of such species** . . . ." Sierra Club v. Marsh, 816 F.2d 1376, 1385 (9th Cir. 1987) (quoting 16 U.S.C. § 1536(a)(2)) (emphasis added). Absent a compelling rationale, the court cannot risk potentially irreparable or irreversible harm to species habitat by reversing FWS and entering the requested injunction.

Similarly, the court declines to enter a portion of Ridge Top's proposed order which would declare that "[t]he determination made by [FWS] that Ridge Top's winning proposal does not provide acceptable habitat mitigation under the ESA is . . . unlawful and is set aside and invalidated." (Proposed Order ¶ 3.) Again, such a remedy may prove appropriate after review of the full record, but there is nothing before the court to suggest the need for such declaratory relief on a preliminary, emergency basis.

### C. The court must hear from defendants regarding the Propriety of the analysis in the Amended Biological Opinion

What remains is that portion of the proposed preliminary

1  injunction which would enjoin the defendants "from taking any

2  action that would directly or indirectly grant approval for

3  Caltrans and/or the [STA] to obtain the mitigation described in

4  the [RFP], including habitat mitigation for the California red-

5  legged frog, from any source other than Ridge Top." (Proposed

6  Order ¶ 2.) If the court were to enter this injunction, FWS would

7  be unable to approve either the Ridge Top Proposal or any other

8  proposal until the court reached a determination on the merits of

9  Ridge Top's claims. Such relief would preserve the status quo

10  pending a determination on the merits, and as such, appears

11  appropriate.

12      The question, then, is whether Ridge Top has established the

13  need for the requested preliminary relief. The court's principal

14  concern is whether Ridge Top has made a sufficient showing as to

15  the likelihood of its success on the merits of its claims, given

16  that Caltrans reinitiated consultation on the Interchange Project

17  *before* FWS rejected the Ridge Top Proposal.

18      Ordinarily, "[f]ormal consultation is terminated with the

19  issuance of a biological opinion." 50 C.F.R. § 402.14(l)(1).

20  Nevertheless,

21      [r]einitiation of formal consultation is
        required and shall be requested by the
22      Federal agency[5] or by the Service, where
        discretionary Federal involvement or control
23      over the action has been retained or is
        authorized by law and:
24

25      (a) If the amount or extent of taking
        specified in the incidental take statement is
26      exceeded;

27  _____

28  [5] As noted above, Caltrans stands in the shoes of the Federal
    agency on this project.

14

1

2

3

    (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

4

5

6

    (c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

7

8

    (d) If a new species is listed or critical habitat designated that may be affected by the identified action.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

50 C.F.R. § 402.16. The Ninth Circuit has held that "[w]hen consultation is reinitiated, the statutory prohibition of section 7(d) [of the ESA] will apply." Marsh, 816 F.2d at 1389. That section provides that "[a]fter initiation of consultation . . . the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures . . . ." 16 U.S.C. § 1536(d). The Ninth Circuit has also held that "[w]hen reinitiation of consultation is required, the original biological opinion loses its validity, as does its accompanying incidental take statement, which then no longer shields the action agency from penalties for takings." Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt., 698 F.3d 1101, 1108 (9th Cir. 2012). An incidental take statement is necessarily subsidiary to the accompanying biological opinion "because the [i]ncidental [t]ake [s]tatement's primary function is to authorize the taking of animals incidental to the execution of a particular proposed action." Oregon Natural

28

1  Res. Council v. Allen, 476 F.3d 1031, 1036 (9th Cir. 2007).

2      The record shows that, on May 30, 2013, Caltrans informed

3  FWS via e-mail that it was planning to reinitiate consultation on

4  the Biological Opinion; Caltrans then followed up with a letter,

5  dated July 24, 2013, requesting reinitiation of formal

6  consultation. (Amended Biological Opinion 2; Reinitiation

7  Request.) It appears, in light of the precedents cited above,

8  that the Biological Opinion and the Incidental Take Statement

9  were invalid as of July 24; it is therefore difficult to

10  understand how FWS could have subsequently approved the Ridge Top

11  Proposal (or any other proposal, for that matter) until the

12  reinitiated consultation was completed.

13      Defendants further contend that any alleged legal errors in

14  the August 6 and September 3 Letters have been rectified by the

15  Amended Biological Opinion. They argue that FWS "has now

16  specifically incorporated its interpretation of the [Biological

17  Opinion's] conservation requirements, as set forth in the

18  September 3 Letter, into the Terms and Conditions of the

19  [Biological Opinion]." (Opposition 23-24.) Defendants then cite

20  Grand Canyon Trust v. U.S. Bureau of Reclamation, 691 F.3d 1008,

21  1017 (9th Cir. 2012) as authority for the proposition that

22  "issuance of a superseding or amended biological opinion and

23  [incidental take statement] moots issues relating to the

24  preceding [biological opinion and incidental take statement]."

25  (Reply 24.)

26      The record shows that FWS did not release the Amended

27  Biological Opinion until after Ridge Top had filed both this

28  action and the instant motion. Accordingly, Ridge Top was not

1   able to address the Amended Biological Opinion until its Reply

2   herein (ECF No. 16.)

3        Ridge Top attacks the Amended Biological Opinion as an

4   "arbitrary, capricious and unlawful agency action that should be

5   invalidated . . . ." (Reply 11.) It alleges the following

6   substantive flaws in the document:

- The new requirement that California red-legged frog
  habitat mitigation be located within two miles of the
  Interchange Project site is substantially different from
  the corresponding requirement in the Incidental Take
  Statement, which allowed habitat mitigation to be
  obtained anywhere within, or in the vicinity of, frog
  critical habitat within California – habitat which
  apparently encompasses more than 1.5 million acres of
  land in twenty-seven California counties. According to
  Ridge Top, FWS neither based this new requirement on the
  "best scientific and commercial data available," 16
  U.S.C. § 1536(a)(2) (addressing consultation
  requirements), nor did the agency "examine the relevant
  data and articulate a satisfactory explanation for its
  action including a rational connection between the facts
  found and the choice made." (Reply 13) (quoting <u>Motor
  Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm
  Mutual Auto Ins. Co.</u>, 463 U.S. 29, 42 (1983)).

- FWS's assertion in the Amended Biological Opinion that
  impacts to the California red-legged frog and/or its
  habitat have increased are "demonstrably false[,]" as the

1    impacts FWS cites are contemplated by the initial

2    Biological Opinion.[6] (Reply 13-14.)

3  In assessing Ridge Top's likelihood of success on the merits, the

4  court must decide whether, in issuing new requirements for

5  California red-legged frog habitat mitigation, FWS articulated "a

6  rational connection between the facts found and the choice made."

7  Arizona Cattle Growers' Ass'n, 273 F.3d at 1236. The court must

8  also address the implicit, related issue of whether FWS had the

9  legal authority to revise requirements that apparently were not

10  raised by Caltrans in its reinitiation request and follow-on

11  communications with FWS. The court finds it necessary to hear

12  from defendants as to these matters.

13    In light of the foregoing, the court hereby orders as

14  follows:

15    [1] Defendants are DIRECTED to file a sur-reply that

16    addresses the following issues:

17        [a] In what ways does the Ridge Top Proposal fail to

18        meet the requirements of the Amended Biological Opinion

19        for California red-legged frog habitat mitigation?

20

21        [b] What facts did the Amended Biological Opinion

22        adduce to justify modifying those requirements for

23  ─────────────

24  [6] The Ninth Circuit has taken the position in at least one case
that "if . . . data is new and the new data may affect the . . .

25  critical habitat analysis, then the FWS [is] obligated to
reinitiate consultation pursuant to 50 C.F.R. § 402.16. If the

26  data [is] preexisting, then the FWS is to be faulted for not
generating the information in time for the initial [Biological

27  Opinion]." Gifford Pinchot Task Force v. U.S. Fish & Wildlife
Serv., 378 F. 3d 1059, 1077 (9th Cir. 2004), amended by 387 F.3d

28  968 (9th Cir. 2004).

California red-legged frog habitat mitigation initially
set forth in the Biological Opinion?

[c] What explanation does the Amended Biological
Opinion provide for modifying the requirements for
California red-legged frog habitat mitigation initially
set forth in the Biological Opinion?

[d] Were the revised requirements for California red-
legged frog habitat mitigation based on the "best
scientific and commercial data available," 16 U.S.C.
§ 1536(a)(2)?

[e] On the basis of what legal authority did the
Service revise the requirements for California red-
legged frog habitat mitigation?

Defendants' sur-reply must be filed no later than February
7, 2014 at 4:30 p.m. and may be no longer than fifteen (15)
pages in length.

[2] A hearing on Ridge Top's motion for preliminary
injunction is specially SET for February 21, 2014 at 10:00
a.m. in Courtroom 4.

IT IS SO ORDERED.

DATED:  January 31, 2014.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT