1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11   RIDGE TOP RANCH, LLC,              No.  CIV. S-13-2462 LKK/CKD

12                Plaintiff,

13        v.                            **ORDER**

14   UNITED STATES FISH & WILDLIFE
     SERVICE; DANIEL M. ASHE,
15   DIRECTOR, UNITED STATES FISH
     AND WILDLIFE SERVICE,
16
                  Defendants.
17

18

19      Plaintiff Ridge Top Ranch, LLC has sued defendants U.S. Fish

20   and Wildlife Service ("FWS," or the "Service"), and FWS's

21   Director, Daniel M. Ashe, alleging violations of the Endangered

22   Species Act ("ESA") and the Administrative Procedure Act ("APA").

23   Ridge Top's motion for a preliminary injunction came on for

24   hearing on February 21, 2014. Having considered the parties'

25   arguments and their filings herein, the court will deny the

26   motion, for the reasons set forth below.

27   ////

28   ////

                                    1

I.   **BACKGROUND**

### A. Statutory Background

The court will begin by noting relevant aspects of the ESA and its implementing regulations, in order to provide context for the discussion that follows.

In enacting the ESA, "Congress' intent [was] to provide comprehensive protection for endangered and threatened species." Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 698 (1995). An "endangered" species is "in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6). A "threatened" species is "likely to become an endangered species within the foreseeable future . . . ." 16 U.S.C. § 1532(20). "[T]he ESA was enacted not merely to forestall the extinction of species (*i.e.*, promote . . . species survival), but to allow a species to recover to the point where it may be delisted." Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1070 (9th Cir. 2004), amended by 387 F.3d 968 (9th Cir. 2004). "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." TVA v. Hill, 437 U.S. 153, 184 (1978).

ESA Section 7 imposes an affirmative duty on federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species . . . ." 16 U.S.C. § 1536(a)(2). In order to ensure compliance with this

2

requirement, agencies, before beginning designated actions (such as "major construction activities") must prepare a biological assessment to determine whether listed species or critical habitat "are likely to be adversely affected" by the proposed action. 50 C.F.R. § 402.12. If so, the agency must formally consult with the appropriate consulting agency – here, FWS – before undertaking the action. 50 C.F.R. § 402.14.

Formal consultation concludes with FWS's issuance of a biological opinion that addresses "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4). If jeopardy or adverse modification is likely, "then any take resulting from the proposed action is subject to section 9 liability (unless that take is authorized by other provisions of the ESA not relevant here)."[1] Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt., 698 F.3d 1101, 1107 (9th Cir. 2012). Although an agency is "technically free to disregard the Biological Opinion and proceed with its proposed action . . . it does so at its own peril (and that of its employees), for 'any person' who knowingly 'takes' [a member of] an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment." Bennett v. Spear, 520 U.S. 154, 170 (1997). Due to the stringency of these

_____

[1] Section 9 of the ESA prohibits, *inter alia*, the taking of any member of an endangered species. 16 U.S.C. § 1538(a)(1)(B). To "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

3

1   penalties, the Supreme Court characterizes the effect of

2   biological opinions as "virtually determinative" of agency

3   compliance. Id.

4        On the other hand, if FWS concludes that no species jeopardy

5   or adverse modification of critical habitat will occur, but that

6   the project is nevertheless likely to result in the "incidental

7   take" of species members, it must issue an incidental take

8   statement along with the biological opinion. 50 C.F.R.

9   § 402.14(i). The incidental take statement must: "(1) specify the

10  impact of the incidental taking on the species; (2) specify the

11  'reasonable and prudent measures' that the FWS considers

12  necessary or appropriate to minimize such impact; (3) set forth

13  'terms and conditions' with which the action agency must comply

14  to implement the reasonable and prudent measures (including, but

15  not limited to, reporting requirements); and (4) specify the

16  procedures to be used to handle or dispose of any animals

17  actually taken." Or. Natural Res. Def. Council v. Allen, 476 F.3d

18  1031, 1034 (9th Cir. 2007) (quoting 16 U.S.C. § 1536(b)(4) and 50

19  C.F.R. § 402.14(i)). The incidental take statement "functions as

20  a safe harbor provision immunizing persons from Section 9

21  liability and penalties for takings committed during activities

22  that are otherwise lawful and in compliance with its terms and

23  conditions." Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,

24  273 F.3d 1229, 1239 (9th Cir. 2001). Nevertheless, the agency is

25  under an ongoing obligation to report to FWS on "the progress of

26  the action and its impact on the species," and if "during the

27  course of the action the amount or extent of incidental

28

4

1    taking . . . is exceeded," the agency "must reinitiate

2    consultation immediately." 50 C.F.R. § 402.14(i)(3),(4).

3        The agency must also reinitiate consultation if one of these

4    four conditions obtains:

5            (a) If the amount or extent of taking
6            specified in the incidental take statement is
             exceeded;

7            (b) If new information reveals effects of the
8            action that may affect listed species or
             critical habitat in a manner or to an extent
9            not previously considered;

10           (c) If the identified action is subsequently
             modified in a manner that causes an effect to
11           the listed species or critical habitat that
             was not considered in the biological opinion;
12           or

13           (d) If a new species is listed or critical
14           habitat designated that may be affected by
             the identified action.
15

16   50 C.F.R. § 402.16. "When reinitiation of consultation is

17   required, the original biological opinion loses its validity, as

18   does its accompanying incidental take statement, which then no

19   longer shields the action agency from penalties for takings."

20   Ctr. for Biological Diversity, 698 F.3d at 1108.

21       With this overview in mind, the court turns to the facts

22   presented herein.

23           **B. Factual & Procedural Background**

24              **1. The Interchange Project**

25       This case arises by virtue of a proposed highway

26   construction project in Solano County, described as follows:

27           The Solano Transportation Authority (STA) is
28           a Joint Powers Authority with members

                                5

including the cities of Benicia, Dixon,
Fairfield, Rio Vista, Suisun City, Vacaville,
and Vallejo, and the County of Solano . . . .

I-80 is a major transcontinental highway
route, typically six to eight lanes. The
corridor within Solano County functions as an
essential commuter route within the San
Francisco Bay Area . . . .

The existing I-80/I-680/SR 12 interchange
complex was constructed approximately 40
years ago, and current traffic demands have
resulted in extreme congestion, delays,
substantial traffic diversion, and
unacceptable levels of service. The proposed
improvements are designed to reduce
congestion, accommodate anticipated increases
in traffic, and address safety concerns.

Caltrans, in cooperation with the STA and the
Federal Highway Administration, proposes to
improve the interchanges . . . in the
vicinity of City of Fairfield . . . .
(Request for Proposals 1, Exh. B to
Declaration of Timothy G. Roberts ("Roberts
Decl."), ECF No. 10-3.)

In connection with this effort, termed the I-80/I-680/SR-12

Interchange – Phase 1 Project ("Interchange Project"), the

California Department of Transportation ("Caltrans")[2] initiated

consultation with FWS regarding the effects of the Interchange

Project on a number of threatened and endangered species,

including the callippe silverspot butterfly and the California

red-legged frog.[3]

---

[2] Defendants' opposition provides that "for the purposes of ESA
Section 7 Compliance, Caltrans stands in the shoes of [the
Federal Highway Administration] as the federal action agency."
(Opposition 3 n. 3, ECF No. 15.)

[3] The California red-legged frog was listed as a threatened
species on May 23, 1996. 61 FR 25813.

1            **2. The Biological Opinion and the accompanying**

2                        **Incidental Take Statement**

3      At the conclusion of the consultation with Caltrans, FWS

4  issued an initial Biological Opinion, dated April 16, 2012,

5  specifying measures "intended to avoid and minimize direct and

6  indirect effects to California red-legged frog," including the

7  provision of appropriate habitat compensation. (Biological

8  Opinion 25, Exh. C. to Roberts Decl., ECF No. 10-3.)

9      The Biological Opinion identifies three "critical habitat

10 units" for the California red-legged frog which are affected by

11 the Interchange Project, termed "SOL-1," "SOL-2," and "SOL-3."

12 (Each of these habitat units comprises several thousand acres.)

13 According to the Biological Opinion, "SOL-2 is considered

14 essential for the California red-legged frog because it provides

15 connectivity from Napa County south to unit SOL-3 . . . . The

16 connectivity function of the three [] units is dependent upon

17 maintaining red-legged frog passage across I-80 and Jameson

18 Canyon Road . . . ." (Biological Opinion 41-42.)

19     Defendants highlight a portion of the Biological Opinion

20 which describes a pond (the "Mangels' pond") which is "likely the

21 primary population source [for California red-legged frog] for

22 the western portion of the SOL-2 critical habitat unit."

23 (Biological Opinion 53.) The Biological Opinion expresses the

24 following concerns regarding the Interchange Project's effect on

25 this habitat:

26       • "Isolation of this breeding pond from the remainder of

27           the surrounding habitat will reduce the size and

28

distribution of California red-legged frogs in the SOL-2 unit by severing or limiting connectivity of what is now largely contiguous habitat north and south of the proposed Business Center Drive Extension." (Id. 53.)

- "With the addition of the [proposed construction], frogs and other wildlife will be limited to 35 feet of crossing opportunities along the 0.79 mile Business Center Drive Extension . . . . Construction of this barrier will reduce dispersal to 0.8 percent of the original topography that was available for movement. This adverse effect could be partially minimized if one or more breeding ponds would be constructed north of the Business Center Drive Extension." (Id.)

- "The development associated with the proposed Business Center Drive Extension will further reduce available foraging and dispersal habitat for California red-legged frogs that breed in Mangels' pond and disperse widely to the north and west. [Proposed development] is likely to significantly reduce the size and distribution of frogs that occupy the area from Mangels' pond northward into Napa County as animals will become less successful at reaching Mangels' pond to breed and disperse north as juveniles and lose the ability to live in the area south of the road extension as habitat is lost to development." (Id. 53-54.)

//

//

//

8

1    The Biological Opinion then identifies two "keys" to minimizing

2    these adverse effects:

3       1. "Easements south of the proposed Business Center Drive

4          Extension that connect Mangels' pond and the Business

5          Center Drive Extension underpasses," and

6       2. "Easements north of the Business Center Drive Extension."

7          (Biological Opinion 54.)

8    The relevant portion of the Biological Opinion concludes with the

9    following: "Caltrans' proposal to compensate for permanent and

10   temporal habitat loss with in-perpetuity preservation of 245.1

11   acres of California red-legged frog habitat in Solano County will

12   likely offset the adverse effects of the project and provide a

13   benefit for the species. This habitat will be permanently

14   protected and a management plan will be implemented which will

15   aid the species." (Id.)

16       For the purposes of this motion, the most salient portion of

17   the Biological Opinion specifies measures "intended to avoid and

18   minimize direct and indirect effects to California red-legged

19   frog," including the provision of appropriate habitat

20   compensation. (Biological Opinion 25.) Ridge Top highlights the

21   following:

22           California red-legged frog habitat used for
             conservation will be: (1) preferably located
23           within the California Red-Legged Frog
             Conservation Area defined in the Draft Solano
24           HCP (SCWA 2009),[4] (2) within 0.7 mile [*sic*]

25   _____

26   [4] The referenced document appears to be the "Solano Multispecies
     Habitat Conservation Plan Final Administrative Draft," dated June
27   15, 2009, issued by the Solano County Water Agency, available at
     http://www.scwa2.com/Conservation_Habitat_FinalAdminDraft.aspx.
28   (Biological Opinion 72.)

of unobstructed California red-legged frog breeding habitat and non-breeding aquatic habitats, (3) within a California red-legged frog critical habitat unit or within the vicinity of frog critical habitat, and (4) approval [*sic*] by the Service.[5] (Id. 26.)

The Biological Opinion also includes an Incidental Take Statement authorizing "take incidental to the proposed action as: (1) the injury and mortality of two adult or juvenile California red-legged frogs; and (2) the capture, harm and harassment of all California red-legged frogs within the construction footprint." (Id. 58.)

### 3. Request for Proposals; the Ridge Top Proposal

Subsequently, the Solano Transportation Authority ("STA") issued a Request for Proposals, dated May 20, 2013, for California red-legged frog and callippe silverspot butterfly environmental mitigation habitat in connection with the Interchange Project ("RFP"). (Request for Proposals, Exh. B to Roberts Decl., ECF No. 10-3.) The RFP concludes with the following:

Each proposal will be reviewed to determine if it meets the minimum documentation requirements set forth above in Section 3.0 [titled "Scope of Services"]. A Notice of Intent to Award will be issued to the Mitigation Provider offering the lowest cost proposal that meets the minimum requirements. STA staff will start contract negotiations with the selected Provider pending final approval by [FWS] and [the] Regional Water Quality Control Board.

---

[5] At oral argument, both parties acknowledged that these conditions were initially proposed by Caltrans and adopted by FWS. Both parties also conceded that the record does not reveal why the fourth condition places approval in FWS's discretion.

1
2
3
4

> The STA reserves the right to consider or
> reject any and all bids at its own
> discretion. The STA further reserves the
> right to reject all bids and issue a new RFP.
> (RFP 7, ECF No. 10-3.)

5
6
7
8
9

Plaintiff Ridge Top, together with its environmental consultant, WRA, Inc., submitted a proposal in response to the RFP, dated June 7, 2013; the proposal concerns a conservation bank, on land owned by Ridge Top, to be used for mitigation in Solano County. ("Ridge Top Proposal," Exh. A to Roberts Decl., ECF No. 10-3.)

10
11

### 4. Caltrans's reinitiation request; communications regarding the Ridge Top Proposal

12
13
14
15
16
17

On May 30, 2013, shortly before Ridge Top submitted its proposal, Caltrans "informed the Service via an electronic mail (e-mail) message that they were planning to reinitiate consultation on the April 16, 2012 [Biological Opinion]." (Amended Biological Opinion 2, Exh. C to Declaration of Jennifer Norris ("Norris Decl."), ECF No. 18-4.)

18
19
20
21
22
23
24
25
26

On June 14, 2013, FWS "met with Caltrans and [STA's] consultant to discuss the proposed reinitiation. The meeting focused on the gas valve lot relocation."[6] (Amended Biological Opinion 2.) On June 19, 2013, FWS met with Caltrans and STA to discuss the proposals submitted in response to the RFP. According to the Amended Biological Opinion, "The Service was asked to review the sites and provide feedback to STA and Caltrans prior to their selection. STA stated that they favored the Ridge Top Ranch site. The Service informed STA and Caltrans that Ridge Top

27
28

[6] Though this point is not addressed in the parties' briefs, the "gas valve lot relocation" appears to be an aspect of the Interchange Project unrelated to the Ridge Top Proposal.

1    Ranch was not an appropriate site to offset the effects of the

2    project." (Amended Biological Opinion 3.)

3        STA thereafter sent WRA (Ridge Top's environmental

4    consultant) a letter, dated July 9, 2013, which provided in

5    pertinent part:

6                [STA] has evaluated all of the proposals and
                has determined your firm is the "Apparent
7                Successful Proposer" to provide California
                Red-Legged Frog, Callippe Silverspot
8                Butterfly, and Oak Woodland/Riparian Habitat
                for      the      [Interchange      Project]
9                mitigation . . . . I use the term "Apparent
                Successful Proposer" since STA is in the
10               process of submitting your proposal and
                supplementary information to Caltrans for
11               submittal to [FWS] for review and approval.
                Final contract award is predicated on [FWS]'s
12               approval. (Exh. D to Roberts Decl., ECF
                No. 10-4.)
13

14

15   On July 11, 2013, FWS "participated in a conference call with STA

16   and Caltrans regarding the Ridge Top Ranch proposal. The Service

17   explained that Ridge Top Ranch was not appropriate for the

18   project. STA requested that the Service present [its] response in

19   a letter." (Amended Biological Opinion 3.)

20       In a letter dated July 24, 2013, Caltrans notified FWS that

21   it was requesting reinitiation of formal consultation on the

22   Interchange Project. (Exh. B to Norris Decl., ECF No. 18-3.)

23       In a letter to STA and Caltrans, dated August 6, 2013, FWS

24   set forth its view that, while the Ridge Top mitigation site

25   "likely w[ould] provide adequate compensation for the callippe

26   silverspot butterfly[,]" it would not "adequately compensate for

27   the adverse effects on the California red-legged frog that would

28   result from the [Interchange Project]." ("August 6 Letter," Exh.

1   F to Roberts Decl., ECF No. 10-4.) In the Letter, FWS highlighted

2   the importance of the frog being able to "complete long-distance

3   movement between critical habitat units SOL-1, SOL-2, and SOL-3."

4   (Id. 2.) As the Interchange Project threatened loss of habitat

5   connectivity in SOL-2, the FWS determined that "the compensation

6   should include appropriate habitat connectivity." (Id.) The Ridge

7   Top site was found lacking because it "is located at the southern

8   end of critical habitat unit SOL-1 and it will not enhance or

9   maintain movement through SOL-2 between the coast range and

10  critical habitat units SOL-1 and SOL-3." (Id. 3.)

11      STA then sent WRA (Ridge Top's environmental consultant) a

12  letter, dated August 12, 2013, which provided:

13          STA's RFP . . . included an extensive list of
            minimum    requirements    for    mitigation
14          proposals. Key amongst them was that the
            mitigation proposals must have "*demonstrated
15          ability to obtain approval by the US Fish and
            Wildlife Service by November 30, 2013.*"
16

17          In order for STA to determine if your
            submittal would meet this requirement,
18          Caltrans submitted WRA's proposal to the US
            Fish and Wildlife Service on July 9, 2013 for
19          review and comment. STA and Caltrans also
            provided the Service supplemental information
20          provided by WRA on July 3, 2013 regarding
            proximity of the site to breeding habitat;
21          WRA's July 8, 2013 correspondence regarding
            further clarification about proximity to
22          breeding habitat and known frog occurrences;
            and, WRA's July 15, 2013 correspondence
23          regarding contamination issues at or near the
            proposed mitigation property.
24

25          The Service has reviewed WRA's mitigation
            proposal and supplemental information and
26          determined the Ridge Top Ranch will not
            adequately compensate for the adverse effects
27

28

on the California red-legged frog that would
result from the Interchange Project . . . .

Unfortunately with this determination by the
Service, your mitigation proposal does not
meet the minimum requirements of STA's
RFP . . . and therefore STA and Caltrans must
move on to the next qualified submittal.
(Exh. E to Roberts Decl., ECF No. 10-4.)
(emphasis in original).

Ridge Top has filed with the court several internal FWS emails

that it obtained through a Freedom of Information Act request.

One such email, dated August 22, 2013, sent by a Deputy Assistant

Field Supervisor in Sacramento, provides:

I believe there is one very large problem
with the current iteration of this letter,
that being the approach of saying one site is
better than another because it is closer to
the impact site. While this may be what we
all want . . . this is not, and never has
been, our mitigation policy in the office.
[. . .] We do not require that impacts be
compensated at the bank closest to the impact
site. This is, in effect, what this current
letter is doing. So whatever your rationale
ends up being for choosing one site over the
other, I think if you go down the current
route of geographically limiting how far out
compensation sites can be from the impact
sites, it will put us in a very vulnerable
legal position. (Exh. L to Roberts Decl., ECF
No. 10-4.)

FWS subsequently sent STA and Caltrans a letter, dated September

3, 2013 ("September 3 Letter," Exh. J to Roberts Decl., ECF

No. 10-4), which it characterizes as a "supplemental letter . . .

restat[ing] that the Ridge Top Ranch site would be acceptable

compensation for the callippe silverspot butterfly but would not

be acceptable for California red-legged frog. [The] response

14

1   further clarified what the Service considered appropriate habitat

2   compensation for the described adverse effects to the California

3   red-legged frog." (Amended Biological Opinion 4.)

### 5. Ridge Top's response

5       Ridge Top, through its counsel, then sent FWS a letter,

6   dated September 9, 2013, setting forth its position that the

7   August 6 and September 3 Letters violated the ESA and the APA.

8   (Exh. I to Roberts Decl., ECF No. 10-4.) Four days later, Ridge

9   Top followed up with a sixty-day notice of its intent to sue FWS

10  for violations of the ESA. (Exh. J to Roberts Decl., ECF No. 10-

11  4.)

12      A Ridge Top employee avers as follows:

> In a telephone conversation on November 22,
> 2013, involving representatives of Ridge Top,
> WRA, Caltrans and [STA], the Caltrans and
> [STA] representatives stated in [sic] that
> that they have solicited bids for
> construction of the [Interchange] Project and
> expect to break ground in April or May of
> 2014. Based on the discussion during that
> telephone conversation, there is a real risk
> that Caltrans and the [STA] will be unwilling
> very soon to accept further delay to the
> [Interchange] Project that may result from
> Fish & Wildlife's position stated in its
> August 6 and September 3 letters mentioned
> above. During that conversation, the Caltrans
> and [STA] representatives specifically
> informed Ridge Top's representatives that the
> requirement in the 4/16/12 Biological Opinion
> that habitat mitigation be in place 60 days
> before [Interchange] Project construction
> begins may require them to obtain the
> mitigation sought by the Solano RFP elsewhere
> than from Ridge Top.[7] (Roberts Decl. ¶ 22.)

_____

[7] This declarant further avers that, unless the requested
injunction is granted, "Caltrans and the [STA] will soon have no
choice but to obtain such mitigation elsewhere than from Ridge

1    On November 26, 2013, Ridge Top filed suit against FWS, asserting

2    claims under the APA, 5 U.S.C. § 706, and the citizen suit

3    provisions of the ESA, 16 U.S.C. § 1540(g).

4        On December 5, 2013, Ridge Top filed the instant motion for

5    a preliminary injunction, seeking to enjoin defendants:

6              1) from taking any action that prevents
               Caltrans and the [STA] from obtaining habitat
7              mitigation from Ridge Top pursuant to Ridge
               Top's winning proposal submitted in response
8              to the [RFP], and

9              2) from taking any action that would directly
10             or indirectly grant approval for Caltrans
               and/or the [STA] to obtain the mitigation
11             described in the [RFP], including habitat
               mitigation for the California red-legged
12             frog, from any source other than Ridge Top.
               (Proposed Order ¶ 2, ECF No. 10-5.)
13

14   Ridge Top also seeks a declaration that "[t]he determination made

15   by [FWS] that Ridge Top's winning proposal does not provide

16   acceptable habitat mitigation under the ESA is . . . unlawful and

17   is set aside and invalidated." (Id. ¶ 3.)

18              **6. The Amended Biological Opinion**

19       On December 19, 2013, FWS issued an amendment to the

20   Biological Opinion. It provides, *inter alia*, that "[a]cceptable

21   compensation [for specified harms to the California red-legged

22   frog] would include the preservation of occupied or dispersal

23   habitat in dispersal distance from the Mangels pond which would

24   maintain the local population of the California red-legged frog

25   and allow movement and connectivity between the SOL-2 and SOL-3

26   critical habitat units." (Amended Biological Opinion 13.) The

27   Top." (Roberts Decl. ¶ 25.)

28

                                   16

Amended Biological Opinion also added Term and Condition 1q, which provides that habitat compensation "shall be subject to Service approval and at a minimum shall be located within 2 miles of the affected frog habitat, have connectivity with the affected frog habitat, be occupied or suitable for dispersal and be located within the affected critical habitat units SOL-2 or SOL-3 . . . ." (Id. 15.) According to defendants, Ridge Top Ranch fails to meet these requirements, as it is located "at the southern end of the SOL-1 critical habitat unit and would not address the loss of northern habitat connectivity between SOL-2 and SOL-3." (Sur-reply 2, ECF No. 23.)

### 7. The court's prior order herein

By order dated January 31, 2014, as corrected on February 3, 2014, the court noted its willingness to consider that portion of Ridge Top's proposed preliminary injunction which would enjoin the defendants "from taking any action that would directly or indirectly grant approval for Caltrans and/or the [STA] to obtain the mitigation described in the [RFP], including habitat mitigation for the California red-legged frog, from any source[.]" (ECF Nos. 21, 22.) Such an injunction would prevent FWS from approving any proposed frog habitat mitigation and thereby preserve the status quo until the court reached a determination on the merits of Ridge Top's claims.

The court was nonetheless concerned that Ridge Top had failed to show a sufficient likelihood of success on the merits to merit injunctive relief. Under Ninth Circuit precedent, it is well-settled that "[w]hen reinitiation of consultation is required, the original biological opinion loses its validity, as

17

does its accompanying incidental take statement, which then no longer shields the action agency from penalties for takings." Ctr. for Biological Diversity, 698 F.3d at 1108. Further, "issuance of a superseding biological opinion moots issues . . . relating to the preceding [biological opinion]." Grand Canyon Trust v. U.S. Bureau of Reclamation, 691 F.3d 1008, 1017 (9th Cir. 2012). It therefore appeared that (i) the Biological Opinion and the Incidental Take Statement were invalid as of July 24, 2013, (ii) FWS could not approve any mitigation proposal until the reinitiated consultation concluded with the issuance of the Amended Biological Opinion, and (iii) any alleged irregularities in FWS's handling of the Ridge Top Proposal were mooted by the Amended Biological Opinion.

In its reply brief, Ridge Top nevertheless attacked the Amended Biological Opinion as an "arbitrary, capricious and unlawful agency action that should be invalidated[,]" (Reply 11, ECF No. 16), and alleged the following substantive flaws in the document:

- The new requirement that California red-legged frog habitat mitigation be located within two miles of the Interchange Project site is substantially different from the corresponding requirement in the Incidental Take Statement, which allowed habitat mitigation to be obtained anywhere within, or in the vicinity of, frog critical habitat within California – habitat which apparently encompasses more than 1.5 million acres of land in twenty-seven California counties. According to Ridge Top, FWS neither based this new requirement on the

18

1    "best scientific and commercial data available," 16

2    U.S.C. § 1536(a)(2) (addressing consultation

3    requirements), nor did the agency "examine the relevant

4    data and articulate a satisfactory explanation for its

5    action including a rational connection between the facts

6    found and the choice made." (Reply 13) (quoting Motor

7    Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm

8    Mutual Auto Ins. Co., 463 U.S. 29, 43 (1983)).

9    • FWS's assertion in the Amended Biological Opinion that

10   impacts to the California red-legged frog and/or its

11   habitat have increased are "demonstrably false[,]" as the

12   impacts FWS cites are contemplated by the initial

13   Biological Opinion. (Reply 13-14.)

14   After reviewing the parties' filings, the court determined that

15   it needed to hear from defendants regarding whether, in issuing

16   new requirements for California red-legged frog habitat

17   mitigation, (i) FWS articulated "a rational connection between

18   the facts found and the choice made," Arizona Cattle Growers'

19   Ass'n, 273 F.3d at 1236, and (ii) whether FWS had the legal

20   authority to revise requirements that apparently were not raised

21   by Caltrans in its reinitiation request and follow-on

22   communications with FWS. (Order, ECF No. 21.) These issues are

23   addressed by defendants' sur-reply. (ECF No. 23).

24   As a final note, defendants have submitted a letter from

25   Caltrans to FWS, dated December 26, 2013, seeking further

26   amendments to the Biological Opinion. (Exh. 1 to Second

27   Declaration of Jennifer Norris ("Second Norris Decl."), ECF

28   No. 23-1.) Defendants contend that this letter constitutes yet

19

1  another request to reinitiate consultation on the Interchange

2  Project. By letter dated February 6, 2014, FWS responded, stating

3  that it needs more information before it will reopen

4  consultation. (Exh. 2 to Second Norris Decl.)

5  **II.  STANDARD**

6      "An injunction is a drastic and extraordinary remedy, which

7  should not be granted as a matter of course." Monsanto Co. v.

8  Geertson Seed Farms, 561 U.S. 139, ___, 130 S. Ct. 2743, 2761

9  (2010).

10     To obtain a preliminary injunction, a plaintiff "must

11  establish that he is likely to succeed on the merits, that he is

12  likely to suffer irreparable harm in the absence of preliminary

13  relief, that the balance of equities tips in his favor, and that

14  an injunction is in the public interest." Winter v. Natural Res.

15  Def. Council, 555 U.S. 7, 20 (2008).

16     Even if the moving party cannot show a likelihood of success

17  on the merits, "serious questions going to the merits and a

18  balance of hardships that tips sharply towards the plaintiff can

19  support issuance of a preliminary injunction, so long as the

20  plaintiff also shows that there is a likelihood of irreparable

21  injury and that the injunction is in the public interest."

22  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135

23  (9th Cir. 2011) (internal quotation omitted). See also DISH

24  Network Corp. v. FCC, 653 F.3d 771, 776 (9th Cir. 2011) ("To

25  warrant a preliminary injunction, [the moving party] must

26  demonstrate that it meets all four of the elements of the

27  preliminary injunction test established in Winter[.]").

28

In determining whether a preliminary injunction should issue, the court is free to consider inadmissible evidence, including hearsay. Herb Reed Enters. v. Florida Entm't Mgmt., 736 F.3d 1239, 1250 n. 5 (9th Cir. 2013).

## III. ANALYSIS

### A. Request for Judicial Notice

Five days after defendants filed their sur-reply, Ridge Top, without leave of the court, filed a request for judicial notice. (ECF No. 26.) Ridge Top requests that the court take notice of a letter, dated February 11, 2014, from Caltrans to FWS's Sacramento office, which criticizes both the process used to generate the Amended Biological Opinion and that Opinion's content, particularly the modified requirements for California red-legged frog habitat.

Six days later, defendants (also without leave of the court) filed a responsive request for judicial notice, seeking notice of a letter, dated February 18, 2014, from FWS to Caltrans that purports to rebut the criticisms in Caltrans's letter. (ECF No. 29.)

Ridge Top argues that judicial notice of the February 11 Caltrans letter may be taken under Fed. R. Evid. 201(b), which provides that a fact may be judicially noticed if it is "not subject to reasonable dispute," either because it is "generally known within the territorial jurisdiction of the trial court" or it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Ridge Top has failed to identify the "source whose accuracy cannot

reasonably be questioned" to which the court may resort to verify

the letter. Moreover, the court declines to take judicial notice

of this document wholesale, as to do so may lead to unforeseen

consequences. Per Wright & Miller:

> Courts could save themselves much grief and
> embarrassment by insisting that lawyers
> specify precisely the fact to be noticed.
> Similarly, lawyers should treat precedents
> with suspicion when the fact noticed seems
> loosely stated. For example, courts that do
> not specify the "fact" being noticed when
> they take notice of "court records" can end
> up turning a hearsay statement into "truth"
> by the alchemy of judicial notice. Astute
> courts reiterate that while court records may
> be sources of reasonably indisputable
> accuracy when they memorialize some judicial
> action, this does not mean that courts can
> notice the truth of every hearsay statement
> filed with the clerk. To do so would make
> judicial notice a kind of bastard res
> judicata in which parties end up being bound
> by facts they never had any opportunity to
> contest. Courts can avoid this by carefully
> specifying just what is being noticed; *e.g.*,
> that the court merely notices that something
> was said at a hearing for the purpose of
> inferring its affect [*sic*] on the persons who
> heard it, not for its truth.

21B Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 5104 (2d. ed. 2013) ("Facts Judicially Noticeable;

Indisputability").

   Alternately, Ridge Top argues that judicial notice may be

taken under Fed. R. Evid. 902(1), which provides that "[a]

document that bears a seal purporting to be that of . . . any

state . . . of the United States . . . and a signature purporting

to be an execution or attestation" is self-authenticating and

therefore requires "no extrinsic evidence of authenticity in

22

1    order to be admitted[.]" Ridge Top misunderstands the purpose of

2    the cited Rule of Evidence, which is intended to streamline the

3    foundational requirements for certain documents, rather provide

4    an alternate basis for judicial notice.

5         Defendants, in turn, seek judicial notice of FWS's February

6    18 letter to Caltrans "pursuant to the same principles" under

7    which Ridge Top sought judicial notice. (ECF No. 29.) Defendants'

8    request fails for the same reasons that Ridge Top's does.

9         Finally, even if the court were to take judicial notice of

10   these letters, it could not ascribe any truth to the

11   representations contained in either. "A court can only take

12   judicial notice of the *existence* of those matters of public

13   record . . . but not of the *veracity* of the arguments and

14   disputed facts contained therein." U.S. v. S. Cal. Edison Co.,

15   300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) (Wanger, J.). It is

16   therefore unclear what the parties hoped to accomplish by

17   submitting these letters to the court.

18                    **B. Motion for Preliminary Injunction**

19        The question, then, is whether to preliminarily enjoin FWS

20   from taking any action that would directly or indirectly grant

21   approval for Caltrans and/or the STA to obtain the mitigation

22   described in the RFP, including habitat mitigation for the

23   California red-legged frog, from any source, including Ridge Top.

24   Such an injunction would preserve the status quo pending a

25   determination on the merits.

26        In its complaint, Ridge Top seeks, in addition to attorneys'

27   fees and costs, the following:

28

A.  A declaratory judgment invalidating the determination made by Defendant Fish & Wildlife in its August 6 and September 3, 2013 letters that Ridge Top's proposal in response to the Solano RFP will not provide acceptable mitigation for the adverse effects of the I-80/I-680/SR 12 Interchange project on the California red-legged frog – that is, the Unlawful Fish & Wildlife Determination mentioned above.

B. An injunction that 1) prevents Defendant Fish & Wildlife and its Director from taking any action that prevents Caltrans and the Solano Transportation Authority from obtaining habitat mitigation from Ridge Top pursuant to Ridge Top's winning proposal submitted in response to the Solano RFP, and 2) prevents Fish & Wildlife from taking any action that would directly or indirectly grant approval for Caltrans and/or the Solano Transportation Authority to obtain the mitigation described in the Solano RFP, including habitat mitigation for the California red-legged frog, from any source other than Ridge Top. (Complaint, ECF No. 1.)

Having thoroughly considered the parties' arguments and the record, it appears that Ridge Top has no likelihood of obtaining these remedies, and therefore, that its motion for a preliminary injunction should be denied.

Under ESA Section 7, FWS's paramount obligation is to "insure" that the Interchange Project "is not likely to . . . result in the destruction or adverse modification of habitat of [endangered or threatened] species . . . ." 16 U.S.C. § 1536(a)(2). In fulfilling this statutory mandate, the agency must, of course, follow all relevant procedural obligations imposed by the ESA and the APA. But what is apparent to the court is that, while the agency has an obligation to correct its

24

1  procedural missteps, such missteps alone cannot be grounds for

2  compelling the agency to violate its statutory mandate. In other

3  words, a district court cannot compel FWS to accept a mitigation

4  proposal that, in the agency's view, does not satisfactorily

5  compensate for the adverse effects to California red-legged frog

6  habitat. And that is precisely the remedy which Ridge Top seeks

7  in its complaint.

8      In their sur-reply, defendants take the position that the

9  Biological Opinion itself provides a sufficient basis for the new

10  requirement that habitat compensation "shall be subject to

11  Service approval and at a minimum shall be located within 2 miles

12  of the affected frog habitat, have connectivity with the affected

13  frog habitat, be occupied or suitable for dispersal and be

14  located within the affected critical habitat units SOL-2 or SOL-

15  3." (Sur-reply 2) (quoting Amended Biological Opinion 15).

16      Defendants assert "wide discretion" to impose this

17  requirement in approving habitat mitigation proposals, because

18  FWS approval is one of the four conditions for acceptable habitat

19  compensation included in the Biological Opinion.[8] (Sur-reply 2.)

20      [8] The court notes that defendants' position is arguably
    problematic in light of Ninth Circuit precedent interpreting the
21  ESA. In Gifford Pinchot, the Ninth Circuit faulted FWS for
    issuing amendments to certain challenged biological opinions
22  without reinitiating the consultation process, writing that that
    "if . . . data is new and the new data may affect the . . .
23  critical habitat analysis, then the FWS [is] obligated to
    reinitiate consultation pursuant to 50 C.F.R. § 402.16. If the
24  data [is] preexisting, then the FWS is to be faulted for not
    generating the information in time for the initial [Biological
25  Opinion]." 378 F.3d at 1077. In the earlier Arizona Cattle
    Growers' Ass'n, the Ninth Circuit criticized FWS's attempt to
26  cite evidence outside the administrative record in support of a
    challenged Incidental Take Statement as follows:
27

28          Considering evidence outside the record would
            render    the    extraordinarily    complex

1   Defendants also claim that they have adduced sufficient new

2   data (*i.e.*, data collected after the Biological Opinion was

3   issued) to justify the revised habitat mitigation requirements

4   set forth in the Amended Biological Opinion. Defendants note

5   that, "As the reinitiation process unfolded, Caltrans provided

6   additional information indicating that other project activities

7   would impact [California red-legged frog] in ways not analyzed in

8   the [Biological Opinion]." (Sur-reply 5.) This information

9   includes:

10      • The discovery of at least five frogs[9] in an area

11        designated "Wetland 149a," which is eventually slated

12          consultation process, which includes
13          reporting requirements and public comment
            periods, meaningless. It would also allow the
14          consulting agency to produce far reaching and
            unsupported Biological Opinions knowing that
15          it could search for evidentiary support if
            the opinion was later challenged.
16          Furthermore, the Fish and Wildlife Service's
            own regulations do not contemplate this
17          result, but instead mandate the reinitiation
            of consultation if circumstances change or
18          new facts are discovered. 50 C.F.R. § 402.16.
            Thus, we review the Biological Opinion based
19          upon the evidence contained in the
            administrative record.

20   273 F.3d at 1245. While neither case is directly on point – as
     FWS is not relying herein on evidence outside the record, and
21   Caltrans reinitiated consultation before FWS released the Amended
     Biological Opinion – these decisions at least suggest that for
22   FWS to retain wide discretion to approve or reject habitat
     mitigation proposals on any basis that might be derived from the
23   Biological Opinion may open FWS to charges of arbitrary and
     capricious behavior or accusations that it has abused its
24   discretion.

25   [9] At oral argument, Ridge Top's counsel asserted that the five
     frogs appeared in this area because of a leaking pipe.
26   Defendants' counsel responded that Ridge Top could not establish
     a causal relationship between the leak and the presence of the
27   frogs. She further argued that, while the Incidental Take
     Statement allowed for the take of 2 frogs, Caltrans continued
28   construction activities in the area and thereby put 5 frogs at

1    to be removed, as it is within a planned right-of-way.[10]

2    (Amended Biological Opinion 5.) Defendants allege that

3    Wetland 149a is south of the Mangels' pond. (Recall

4    that this pond is "likely the primary population source

5    [for California red-legged frog] for the western

6    portion of the SOL-2 critical habitat unit."

7    (Biological Opinion 53.))

8    • Identification of "an additional 0.17 acre of work

9       space . . . to complete a directional drill"; Caltrans,

10      in turn, identified this space as California red-legged

11      frog habitat. (Amended Biological Opinion 5.)

12   • Potential road realignment, impacting California red-

13      legged frog habitat. (Id. 5-6.)

14   • An email message from Caltrans to FWS expressing a

15      desire to revise Conservation Measure 24a, "intended to

16      avoid and minimize direct and indirect effects to

17      California red-legged frog." (Id. 6; Biological Opinion

18      25.)

19   According to defendants, after FWS analyzed all of this

20   information, it "concluded that Caltrans' construction activities

21   _____

22   risk. Whether the facts are as Ridge Top or as defendants portray
     them, they do not change the analysis herein.

23   [10] The Amended Biological Opinion also provides that FWS "informed
     Caltrans that the current condition with Wetland 149a being

24   inundated and occupied by the California red-legged frog was not
     reflected in [the Biological Opinion] and that this new

25   information would trigger a reinitiation of consultation."

26   (Amended Biological Opinion 5.) In other words, this information
     was not considered in the Biological Opinion, thereby

27   contradicting Ridge Top's assertion that "the presence of frogs
     in those areas was *explicitly* contemplated in the [Biological

28   Opinion] and is not a new fact . . . ." (Reply 14).

1  in the immediate vicinity of the occupied wetland area

2  represented a risk of [California red-legged frog] take not

3  analyzed in, or authorized by, the [Biological Opinion]." (Sur-

4  reply 6) (citations to Amended Biological Opinion omitted). FWS

5  also determined that "the proposed changes will result in

6  additional loss of habitat, including direct effects to breeding

7  habitat." Id. Consequently, the agency decided to place a

8  "greater emphasis on Caltrans providing conservation that

9  directly addresses the adverse effects" on California red-legged

10 frog habitat (Amended Biological Opinion 13), and revised the

11 Amended Biological Opinion accordingly. (Sur-reply 6.)

12      The Supreme Court has described the standard for reviewing

13 agency action under the APA as follows:

14          The scope of review under the "arbitrary and
            capricious" standard is narrow and a court is
15          not to substitute its judgment for that of
            the agency. Nevertheless, the agency must
16          examine the relevant data and articulate a
            satisfactory explanation for its action
17          including a rational connection between the
            facts found and the choice made. In reviewing
18          that explanation, we must consider whether
            the decision was based on a consideration of
19          the relevant factors and whether there has
            been a clear error of judgment. Normally, an
20          agency rule would be arbitrary and capricious
            if the agency has relied on factors which
21          Congress has not intended it to consider,
            entirely failed to consider an important
22          aspect of the problem, offered an explanation
            for its decision that runs counter to the
23          evidence before the agency, or is so
            implausible that it could not be ascribed to
24          a difference in view or the product of agency
            expertise. The reviewing court should not
25          attempt itself to make up for such
            deficiencies: We may not supply a reasoned
26          basis for the agency's action that the agency
27
28

                                28

> itself has not given. We will, however,
> uphold a decision of less than ideal clarity
> if the agency's path may reasonably be
> discerned.

Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (internal citations and

quotations omitted).

It is evident to the court that FWS's decision to reject the

Ridge Top Proposal as inadequate meets the standards set forth in

this passage. Whether (i) FWS's justification was articulated in

the Biological Opinion but was mistakenly omitted from the

initial requirements,[11] or (ii) Caltrans and FWS contemplated a

process whereby the requirement of FWS approval would allow the

agency to evaluate habitat compensation proposals as they were

submitted, or (iii) new data was presented to FWS that led to the

revised requirements in the Amended Biological Opinion, there is

no evidence to suggest that "the agency has relied on factors

which Congress has not intended it to consider, entirely failed

to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be

ascribed to a difference in view or the product of agency

expertise." Id.

To find in Ridge Top's favor, the court would have to

second-guess the agency's scientific and technical determination.

---

[11] At oral argument, Ridge Top's counsel conceded that FWS had the
power to correct mistakes in the Biological Opinion, provided
that the agency "examine[d] the relevant data and articulate[d] a
satisfactory explanation for its action including a rational
connection between the facts found and the choice made." Motor
Vehicle Mfrs. Ass'n, 463 U.S. at 43 (internal quotation omitted).

But FWS's reasoned determination to alter California red-legged frog habitat mitigation requirements "is precisely the sort of decision within the agency's technical expertise that we are not free to second-guess." Arizona Cattle Growers' Ass'n, 606 F.3d at 1171. None of this should minimize the very real concerns for procedural transparency and fairness that are implicated by this case. FWS ought to have done a better job of specifying requirements for habitat mitigation in the Biological Opinion. But such procedural criteria cannot trump the agency's obligation to the statute. Ridge Top has no chance of success given that FWS has concluded that the existing data support the more-rigorous habitat requirements set forth in the Amended Biological Opinion.

Ridge Top disputes the validity of the Amended Biological Opinion because, it contends, the revisions to the habitat requirements far exceed the scope of Caltrans's reinitiation request. (Reply 12-13.) Caltrans's request provides that it reopened consultation based on "project design modifications [that] do not change any of the determinations in the [Biological Opinion,]" though it conceded that "the project footprint and the area of impacts to listed species (California red legged frog and Callippe silversport butterfly) will increase, by a small amount . . . ." (Exh. C to Norris Decl., ECF No. 15-3.)

FWS responds as follows:

> To the extent that any of the Court's questions, or Plaintiff's arguments, imply that the scope of reinitiated consultation is limited by the reinitiation trigger, [defendants] respectfully disagree. After an action agency reinitiates consultation, nothing in the statute or the regulations

> limits the agency's authority or the scope of
> the reinitiated consultation process. Rather,
> the Service is obligated to update the
> analyses of its biological opinion to conform
> to all of the requirements of ESA Section 7,
> 16 U.S.C. § 1536; 50 C.F.R. § 402.14. (Sur-
> reply 10-11.)

The court can find no legal authority to the contrary. FWS was not obligated to tailor the parameters of the Amended Biological Opinion to fit the contours of Caltrans's reinitiation request. Accordingly, it appears that defendants had the legal authority to issue amended requirements for California red-legged frog habitat mitigation even if these requirements were not the basis for Caltrans's request to reinitiate consultation.

Ridge Top also contends that defendants failed to comply with the ESA Section 7 mandate that "[i]n fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). Specifically, Ridge Top contends that FWS failed to "use the best scientific and commercial data available" in promulgating new habitat mitigation requirements. (Reply 13.)

Defendants respond that the revised requirements for California red-legged frog habitat mitigation are in fact based on "the best scientific and commercial data available." (Sur-reply 7.) More than six pages of the Biological Opinion are devoted to summarizing and synthesizing scientific publications and data regarding the California red-legged frog and its habitat. (Biological Opinion 32-38.) In reaching its conclusions, FWS also relied upon the "Solano Multispecies Habitat Conservation Plan Final Administrative Draft," which the agency

1    described as including "the most complete regional scientific

2    data and analysis for the California red-legged frog in Solano

3    County." (Id. 42.) According to defendants, FWS's "analysis of

4    the impacts of the project upon CRLF and its critical habitat

5    builds directly upon these analyses and scientific sources."

6    (Sur-reply 8.)

7         The burden lies with the party seeking a preliminary

8    injunction to demonstrate its likelihood of success on the

9    merits. But while Ridge Top characterizes FWS as failing to use

10   the best scientific and commercial data available, it has in turn

11   failed to adduce any support for this claim. Given the

12   significant scientific evidence marshaled by the defendants, the

13   court cannot find in Ridge Top's favor on this point.

14        FWS is immune to suit for damages. Accordingly, the only

15   relief that the court can award is injunctive. But what Ridge Top

16   seeks is not, *e.g.*, an agency remand in order to clarify the

17   record, but an order that would force the agency to approve the

18   Ridge Top Proposal. Yet, whether the agency reached its current

19   position due to its initial data, reconsideration of this data

20   after receiving the initial bids, or new data, the agency's

21   current position regarding compensation requirements appears both

22   reasoned and based on the available data. Under such

23   circumstances, a "court cannot lawfully second-guess the agency,

24   unless clear scientific error or bad faith is so manifest that

25   the agency's judgments can no longer be trusted[,]" which is not

26   the case here. In re Consolidated Salmonid Cases, 791 F. Supp. 2d

27   802, 844 (E.D. Cal. 2011) (Wanger, J.). The court cannot compel

28   FWS to violate its reasoned determination that the Ridge Top

32

1  Proposal fails to meet ESA standards for California red-legged

2  frog habitat compensation.

3      In light of the foregoing, the court hereby DENIES plaintiff

4  Ridge Top's motion for a preliminary injunction.

5      IT IS SO ORDERED.

6      DATED:  March 3, 3014.

7

8

9

10              LAWRENCE K. KARLTON
                SENIOR JUDGE
11              UNITED STATES DISTRICT COURT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28